Dear Mr. Karns:
You have requested an opinion of the Attorney General regarding the proper interpretation and application of R.S. 23:1196(A)(6) as it pertains to Group-Self Insurance Funds for workers' compensation (GSI-Funds).
The following discussion reflects the factual scenario giving rise to your inquiry. This information was compiled from discussions with representatives of the Louisiana Commissioner of Insurance ("Commissioner"), the Louisiana Home Builders Association-Self Insurer's Fund ("LHBA-SIF"), the Louisiana United Businesses Association-Self Insurance Fund ("LUB-SIF") and the Louisiana Association of Self Insured Employers ("LASIE"). We acknowledge, with appreciation, the written memoranda submitted by interested parties setting forth their respective positions.
Prior to addressing the issue presented in your request, we believe that a summary of the relevant statutes and a brief discussion of the circumstances leading up to the enactment of Section 1196(A)(6) would be helpful.
The entitlement to workers' compensation ("w/c") benefits was reinforced by the passage of Act No. 938 of the 1988 Regular Session of the Louisiana Legislature. For the first time, employers were mandated to provide security for their obligation to pay w/c benefits. In the common vernacular, this meant that employers were required by law to have w/c coverage. The acceptable methods by which coverage can be provided are set forth in R.S. 23:1168. It provides, in pertinent part, the following:
 "A. An employer shall secure compensation to his employees in one of the following ways:
 (1) By insuring and keeping insured the payment of such compensation with any stock corporation, mutual association, or other concern authorized to transact the business of workers' compensation insurance in this state, including group self-insurance as authorized in R.S. 23:1191 et seq. . . . ." (Emphasis added.)
R.S. 23:1191, et seq., was enacted in 1979, and authorizes the creation of GSI-Funds. It provided that five or more employers, who are members of the same bona fide trade or professional association, could enter into an agreement to pool their liabilities for w/c converge. The law was amended and reenacted by Act 703 (HB 1630) of the 1995 Regular Session of the Louisiana Legislature, and was redesignated as R.S. 23:1195,et seq. We find the following exerpts of the law, as amended, to be material to the resolution of your inquiry:
 "§ 1195. Authorization; trade or professional association; initial financial requirements
 A. (1) Any five or more Louisiana employers who are not political subdivisions as defined in Section 44 of Article VI of the Constitution of Louisiana, each of whom has a positive net worth, is financially solvent and is capable of assuming the obligations set forth under this Chapter and who is a member of the same bona fide trade or professional association as other employers, may agree to pool their liabilities to their employees on account of personal injury and occupational disease arising out of or incurred during the course and scope of the employment relationship on a fund year basis. This arrangement shall not be deemed to be insurance and shall not be subject to the provisions of Chapter 1 of Title 22 of the Louisiana Revised Statutes of 1950.
 * * *
 (3) The arrangement shall not be a member insured of the Louisiana Insurance Guaranty Association, nor shall the Louisiana Insurance Guaranty Association be liable under any circumstances for any claims, or increments of any claims, made against the arrangement.
 * * *
 C. Each fund shall submit evidence at its inception to the Department of Insurance
which establishes financial strength and liquidity of the members to pay compensation claims promptly and support the financial ability of the fund to satisfy its obligations upon the establishment of the fund . . . .
 § 1196. Requirements; excess insurance; administrative and service companies; status; liability; refunds
 A. Each fund established pursuant to R.S. 23:1195 shall:
 (1) File rates in accordance with R.S. 23:1199 and maintain at least five hundred thousand dollars in direct premium per fund year.
 (2) Conduct a premium audit annually, to be conducted by an independent payroll audit firm approved by the department, or as otherwise may be approved by the commissioner.
 * * *
 (4) Provide statutory worker's compensation benefits.
 (5) Maintain at all times, on a fund year basis, a contract or contracts of specific excess insurance . . . . The maximum retention under the excess insurance contracts shall not exceed amounts as may be provided by the department by regulation.
 (6) [ Subparagraph (6) to be discussed, infra.]
 * * *
 (7) Timely file and report employer loss experience to the National Council on Compensation Insurance in accordance with its procedures or as otherwise approved by the department.
 (8) File with the department
financial statements and reports, including financial statements audited by an independent certified public accountant, and actuarial reports as may be required by the department through duly promulgated regulations.
 * * *
 F. A fund member shall be liable in solido for liabilities of the fund incurred by the fund after the inception of the fund year in which the employer becomes a member of the fund.
 G. Any monies for a fund year in excess of the amount necessary to fund all obligations of the fund may be declared as refundable to the members of the fund by the Board of Trustees.
 § 1197. Authority of the Department of Insurance
 A. No fund shall become operative until issued a certificate of authority by the department.
 B. The certificate of authority shall be continuous until revoked or suspended by the department, or until it is voluntarily surrendered by the fund.
 C. The department shall have the authority to examine the affairs, books, transactions, work papers, files, accounts, records, assets, and liabilities of a fund to determine compliance with this Subpart and with any rules and regulations promulgated by the department or orders and directives issued by the commissioner.
 D. The department shall have authority to issue cease and desist orders and suspend or revoke the certificate of authority of any fund
which the department determines is not in compliance with this Subpart or with any rules and regulations issued by the department or orders and directives issued by the commissioner.
 E. Upon the determination that a fund failed to comply with the provisions of this Subpart, any rules and regulations promulgated by the department or orders and directives issued by the commissioner, the department may levy a fine not to exceed two-thousand dollars for each violation.
 § 1199. Rates
 Each fund shall file rates on an actuarially justified class code basis with the department and may use the rates ninety days after filing, unless the department disapproves the use of rates within the ninety-day period.
 § 1200.1 Rules and Regulations
 The department may issues rules and regulations
which establish the duties of a board of trustees, describe the permissible investments of the fund, set forth the standards and authority of the department under which funds may be deemed to be in hazardous financial condition, prohibit potential conflicts of interest, and otherwise provide for the implementation and administration of the provisions of this Subpart." (Emphasis added.)
The specific language at issue is found at R.S. 23:1196(A)(6):
A. Each fund established pursuant to R.S. 23:1195
shall:
* * *
 (6) Not permit advance premium discounts to any member in excess of fifteen percent of the gross premium of the member, calculated in accordance with the applicable manual premium rate or rates approved by the department, plus or minus applicable National Council on Compensation Insurance experience debits or other experience debits or credits approved by the department." (Emphasis added.)
It is the interpretation of this underscored language that is in dispute.
Prior to its amendment and redesignation, R.S. 23:1196(A)(6) appeared at R.S. 23:1192(A)(4) and (5). It provided:
 "(4) The fund shall not allow advance premium discounts to any member in excess of fifteen percent of that member's gross premium, calculated in accordance with the applicable manual premium rate or rates, plus or minus applicable experience credits or debits.
 (5) Experience debits or credits shall be calculated in accordance with the experience rating formula promulgated by the National Council on Compensation Insurance."
House Bill No. 1630, as originally introduced, was very similar to the existing Section 1192(A)(4) and (5). As can be seen from the following, it did not contain the language at issue:
"A. Each fund established pursuant to R.S.23:1195 shall:
* * *
 (6) Not permit advance premium discounts to any member in excess of fifteen percent of the gross premium of the member, calculated in accordance with the applicable manual premium rate or rates approved by the department plus or minus applicable National Council on Compensation Insurance experience debits or credits."
However, the bill was amended in House Committee to its present form as a result of a request from the GSI-Fund Administrator for the Louisiana Cotton Association (LCA). The Administrator requested the amendment to enable his Fund to use its own in-house experience modification software program. The program had historically proven to be very effective for the LCA. Further, it incorporated the same formula for experience rating used by the National Council on Compensation Insurance ("NCCI"). Thus, an amendment was proposed, adopted and passed, requiring the use of NCCI experience debits or other experience debitsor credits approved by the Department.
Subsequent to the passage of Act 703, and more specifically Section 1196(A)(6), the Commissioner issued "Directive 135", dated December 15, 1995, to clarify his position on the use of discounts and credits by GSI-Funds. The Directive sets forth the Commissioner's interpretation of Section 1196(A)(6) and, in so doing, defines the following terms contained therein:
1. Gross Premium: Premium determined by multiplying the payroll (segregated into the proper workers' compensation job classifications) times the manual premium rates approved by the Commissioner.
2. Manual Premium Rates: Workers' compensation rates by job classification set forth by the National Council on Compensation Insurance or rates by job classification calculated by a qualified actuary based upon adequate loss histories of the fund which are filed with and approved by the Commissioner.
3. Standard Premium: Gross premium plus or minus applicable experience debts or credits.
4. Experience Debits or Credits:
National Council on Compensation Insurance experience debits or other experience debits or credits approved by the Department, including scheduled debits and credits based on experience.
5. Normal Premium: Standard Premium Less Allowed Discount.
The Directive further ordered that, in no case, should the advance premium discount authorized in § 1196(A)(6) exceed fifteen percent of the standard premium. In addition, the Commissioner issued an opinion dated July 21, 1995, regarding the use of schedule credits by GSI-Funds. Therein, the author concludes that the term "discounts", as used in Section 1196(A)(6) includes any practice, method or device by which a deviation is calculated for a particular fund member from the gross premium charged by the fund to its other participating employers. The author further opines that schedule credits constitute acceptable discount devices. However, any combination of schedule credits, discounts or other non-NCCI premium modification factors cannot exceed the fifteen percent ceiling fixed by statute. It is this interpretation that has been challenged as too restrictive by some GSI-Funds, including LUB-SIF.
LUB-SIF argues that the system of schedule rating, as well as other programs which include a combination of NCCI experience debits or credits, schedule rating, retrospective rating and experience debits or credits based on other criteria (e.g., size of premium, safety record, etc.) should be utilized by GSI-Funds for the following reasons, to wit:
1. A reasonable and common sense interpretation of the Louisiana Insurance Code ("Code") allows utilization of schedule credits by GSI-Funds.
2. The Commissioner has authorized schedule credits for insurance companies as per Bulletin 93-01, despite the absence of any express statutory authority therefor in the Code.
3. The Code authorizes insurers to offer premium discounts of up to twenty percent, while GSI-Funds are limited to fifteen percent.
4. The Code allows casualty insurers to establish rates based on any classification deemed reasonable.
5. Directive 135 fixes rates that are unjust, unreasonable and discriminatory so as to discourage reasonable competition, all in contravention of the Code.
6. Schedule credits and/or ratings are separate and distinct from the concept of premium discount; ergo, they should not be subject to the fifteen percent limitation.
7. In the absence of a statutory prohibition against the use of schedule rating and other programs in combination with NCCI experience debits, the Commissioner has the authority to approve same under his inherent regulatory powers.
8. The Commissioner has approved non-NCCI experience debits or credits for LCA.
9. Other states in the Southern Region allow schedule rating for GSI-Funds.
10. LUB-SIF's plan incorporating schedule rating is actuarially sound.
In summary, opponents argue that the restrictive interpretation advocated by the Department constitutes an unreasonable application of the Code resulting in the inability of GSI-Funds to effectively compete against insurance companies.
The Department takes the position that NCCI experience debits or credits must be used unless it approves the use of other experience debits or credits. Further, its approval of such "other experience debits or credits" is limited to experience based rating plans which are equivalent to NCCI's plan. The Department also limits the utilization of such plans toeither NCCI or Department approved plans, but not a combination of more than one plan.
Finally, the Department asserts that the use of schedule credits, while not prohibited, must be limited, along with other acceptable premium modifiers, to the statutory maximum of fifteen percent. The Department justifies its position on the following bases:
1. GSI-Funds are not subject to the statutory provisions comprising the Code.
2. The inherent distinction between traditional insurers and GSI-Funds warrant the application of dissimilar regulations.
3. Its position is supported by the basic rules of statutory construction and interpretation.
4. In the alternative, its interpretation is supported by the historical development of the language of the statute and the fundamental doctrine of contemporaneous construction.
We have considered the memoranda submitted by the parties in support of their respective positions and adopt the more restrictive interpretation advanced by the Department for the following reasons:
In response to LUB-SIF's contentions (1) through (5), relating to the Louisiana Insurance Code, we find the statutory provisions and corresponding rules and regulations applicable to insurers under the Code to be inapplicable to GSI-Funds. R.S. 23:1195, quoted supra, clearly provides that said Funds shallnot be deemed to be insurance and shall not
be subject to the provisions of Chapter 1 of Title 22 of the Louisiana Revised Statutes of 1950, commonly referred to as the "Louisiana Insurance Code". Consequently, reliance upon the Code, and regulations and bulletins promulgated by the Department which are interpretive thereof, are inapposite to the issue at hand.
The distinction between insurers and GSI-Funds are mirrored by the statutory provisions and rules and regulations applicable to each. The following examples are illustrative of the fundamental differences between these two entities which justify the more conservative approach taken by the Department in its regulation of GSI-Funds.
First, under the Code, upon formation, insurers must meet stringent capital and/or surplus requirements. R.S. 22:71, 71.1 and 71.2. By contrast, there are no directly corresponding capital or surplus requirements that mandate GSI-Funds to maintain a minimum stated surplus. To the contrary, the law contemplates that GSI-Funds are owned by participating employers. Because the Fund, itself, is nonprofit in nature, any surplus generated by a GSI-Fund is returnable to its participating members. Those same members would be responsible to the Fund,via assessment, in the event of any shortfall. See R.S.23:1196(F). Thus, a GSI-Fund is more at risk than a traditional carrier in the event its rates for a given fiscal period prove to be inadequate.
Second, unlike the traditional carrier, there is no guaranty association for GSI-Funds. As previously noted, R.S.23:1195(A)(3) provides that said Funds shall not be member insureds of the Louisiana Insurance Guaranty Association, nor shall the Association be liable, under any circumstances, for any claims, or increments thereof, made against the Funds. Consequently, while the consumer is protected in the event of the failure of an ordinary carrier due to the inadequacy of its rate structure, he or she is not as protected against the failure of a GSI-Fund. In other words, there is a greater opportunity for loss to the consumer in the event of a failure of a GSI-Fund and, correspondingly, a greater risk associated with the inadequacy of rates for such funds.
As can be seen from the above, both statutory constraints and the inherent differences in the composition and structure of GSI-Funds, vis-a-vis traditional carriers, warrant the application of dissimilar regulations. It should be emphasized that the regulations pertaining to GSI-Funds, adopted and promulgated by the Department, should be administered so that all GSI-Funds are treated uniformly and fairly to avoid any violations of State and Federal Constitutions. We turn now to the analysis of the statute itself.
As previously noted, Section 1196(A)(6) provides:
"A. Each fund established pursuant to LSA-R.S.23:1195 shall:
* * *
 (6) Not permit advanced premium discounts to any member in excess of fifteen percent of the gross premium of the member calculated in accordance with the applicable manual premium rate or rates approved by the Department, plus or minus applicable National Council on Compensation Insurance experience debits or other experience debits or credits approved by the department."
In interpreting the above provision, we believe the following articles of the Louisiana Civil Code to be relevant and applicable:
Art. 9. Clear and unambiguous law
 When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
 Art. 10. Language susceptible of different meanings
 When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.
 Art. 11. Meaning of words
 The words of law must be given their generally prevailing meaning.
 Words of art and technical terms must be given their technical meaning when the law involves a technical matter.
 Art. 12. Ambiguous words
 When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.
We further believe that the following statutory provisions in Title 1 are relevant and applicable to the proper interpretation of the language in question:
§ 3. Words and phrases; how construed
 Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
 The word "shall" is mandatory and the word "may" is permissive.
 § 4. Unambiguous wording not to be disregarded
 When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregard under the pretext of pursuing its spirit.
 § 9. Use of disjunctive
 Unless it is otherwise clearly indicated by the context, whenever the term "or" is used in the Revised Statutes, it is used in the disjunctive and does not mean "and/or".
While GSI-Funds do not constitute insurance or insurance companies, they are clearly subject to regulation by the Commissioner. The Commissioner's broad sweeping regulatory power is clearly evidenced by the excerpts of Title 23 quoted and underscored, supra, at pages (1) through (5).
In response to LUB-SIF's contentions (6) and (7), as previously noted, the Commissioner, through Directive 135 and the opinion letter dated July 21, 1995, has interpreted the language in Section 1196(A)(6) in the disjunctive thereby prohibiting the use of NCCI experience debits in combination with experience debits or credits approved by the Department. We concur with this interpretation that the use of the phrases "applicable National Council on Compensation Insurance experience debits" and "or other experience debits or credits approved by the department" are mutually exclusive. State v. Will, 536 So.2d 601
(La.App. 1st Cir. 1988). We also concur with the Department's opinion the GSI-Funds may use schedule credits, discounts or other non-NCCI premium modification factors as long as the combination thereof does not exceed the fifteen percent cap imposed by R.S. 23:1196(A)(6). We believe the Department's position is amply supported by the fundamental rules of statutory construction set forth hereinabove.
Addressing LUB-SIF's contention (8), R.S. 23:1196(A)(6) empowers the Department to approve non-NCCI experience debits or credits. As previously noted, the Department approved LCA's in-house experience modification plan based on the same experience rating formula used by the NCCI. LCA's plan was also deemed compatible with the statutory provisions governing GSI-Funds and the regulations, directives and opinions issued by the Department interpretive thereof. Had LUB-SIF's plan fallen within these same strictures, we can only postulate that the plan would have garnered the Department's endorsement. However, this is not the case. As noted hereinabove, the plan submitted by LUB-SIF fails to comply with state law as interpreted by the Department.
In response to LUB-SIF's contention (9), while other states in the Southern Region allow schedule rating for GSI-Funds, the State of Louisiana, pursuant to the legislation enacted on this subject matter, as well as the rules and regulations promulgated by the Commissioner, has elected to restrict the use of schedule rating.
Finally, in response to LUB-SIF's contention (10), the fact that LUB-SIF's plan may be actuarily sound, does not, in and of itself, mandate the Department's adoption and approval. To the contrary, R.S. 23:1199 requires each fund to file rates with the Department which are on an actuarily justified class code basis. The statute vests the Department with the authority to disapprove these rates within a ninety-day period. Thus, while a Fund's rates may be actuarily sound, they may, nevertheless, be incompatible with state law and Department regulations.
While we opine that the language under scrutiny is free from ambiguity, alternatively, we are also mindful of the doctrine of contemporaneous construction. Under said doctrine, when a statute and/or administrative rule or regulation is ambiguous, a long-settled interpretation by those charged with administering the statute/regulation is given substantial and often decisive weight in its interpretation. Traigle v. PPG Industries,Inc., 332 So.2d 777 (La. 1976) and Danna v. Commissionerof Insurance, 228 So.2d 708 (La.App. 1st Cir. 1969), rehearing denied.
Assuming, arguendo, that the language in question is ambiguous, the Department has historically interpreted Section 1196(A)(6) and its predecessor 1192(A)(4)-(5), to subject otherwise unauthorized schedule rating (i.e., schedule debits and credits) and additional premium modifiers, to the fifteen percent advance premium discount cap. Further, the Department's interpretation of the use of NCCI experience debits, ortheir equivalent approved by the Department, is consistent with the legislative history attributable to the adoption of the House Committee amendment to HB 1630 as fully discussed,supra.
Finally, we find the Department's interpretation to be constitutionally sound, and well within its discretion. It is neither arbitrary nor capricious, but rather a valid exercise of its regulatory power over GSI-Funds.
In summary, we concur with the Department's interpretation of R.S. 23:1196(A)(6), finding same to be supported by:(1) the policy and practical considerations applicable to GSI-Funds; (2) the literal language of this statute;(3) the historical evolution of the language contained in the statute; and, alternatively, (4) the doctrine of contemporaneous construction.
Trusting this adequately responds to your inquiries, I am
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: __________________________ ROBERT E. HARROUN, III
Assistant Attorney General
RPI/Rob III/cla
Date Received:
Date Released:
Robert E. Harroun, III Assistant Attorney General